Mr. Justice Hagner
delivered the opinion of the Court:
On the 9th of April 1892, the jury in the Criminal Court found Howard J. Schneider guilty of the murder of his wife. Various motions were interposed, in his name, in that court *434 before the sentence on the 7th of May, and up to the signing of the bill of exceptions on the 30th of September. An appeal from the rulings below was heard in the General Term in December, and a judgment of affirmance rendered in January, 1893. Up to this point nothing had been mentioned in the case of any unsoundness of mind on the part of the prisoner. He had testified as a witness in his own behalf before the jury, and his counsel had argued there, as they did before the General Term, that his testimony was entirely competent and reliable, and should be accepted as true.
Shortly after the decision in the General Term, a petition was filed by the prisoner’s counsel 'stating they were informed and had reason to believe, and did believe, Schneider “ is now insane ” ; and they aiske'd for an order postponing his execution, and that the Criminal Court should institute proceedings to ascertain the truth of this averment. The matter was certified to the General Term, which passed an order* postponing the execution and directing a method, which seemed to be 'the best suited to promote the inquiry.
*435 As a means of assisting the court in the examination, three physicians of known eminence in this particular branch of medical learning, were constituted a commission, charged in the order creating it to make an exhaustive examination of the case, and to return to this court upon their oaths a report of their opinions for our consideration. We caused them to be admonished that we desired and expected the most absolute impartiality on their part in the performance of this important service. A like number of experts were authorized to be examined on the part of the prisoner.
The counsel on Schneider’s behalf produced all the witnesses they desired, twenty-nine in number, and about the same number were examined, on the part of 'the United! States. The examination was conducted in the presence of the court and prisoner, and of the commission. The voluminous testimony has since been carefully examined; the report and supplemental report of the commissioners have been received; and we have bestowed upon the case the fullest consideration. The opinion at which we have all arrived is now to be announced.
The theory of the prisoner’s counsel is, that the shock of the sentence of death, coming after the prolonged strain of four months’ imprisonment and the excitement of the trial, *436 acting upon a mind predisposed to disease, operated to dethrone his reason and render him insane; so that he is now unable to appreciate his present situation as a person condemned to death.
On the part of the United States it is contended Schneider never was and is not now insane; that his alleged illusions and mental peculiarities have no existence in fact, but are merely feigned to enable him to escape punishment; and that he is only malingering.
Although this term is comparatively modern, the practice it describes is neither new nor unusual. It is mentioned in the earliest history, sacred and profane. When David fled from the wrath ,of Saul, he took refuge with Achish, the King of Gath; but fearing the King had not forgotten the death of his champion, Goliah, he sought to excite his pity by assuming to be insane. The incident is -thus narrated in the first book of Samuel, chapter 21:
“And the servants of Achish said unto him, Is not this David the king of the land? did they not sing one to another of him in dances, saying, Saul hath slain his thousands, and David his ten thousands?
“And David laid up these words in his heart, and was sore afraid of Achish the king of Gath.
“And he changed his behavior before them, and feigned himself mad in their hands, and scrabbled on the doors of the gate, and let his spittle fall down upon his beard.
“ Then said Achish unto his servants, Lo, ye see the man is mad: wherefore then have ye brought him to me ?
1“ Have I need of madmen, that ye have brought this fellow to'play the madman in my presence ? shall this fellow come into my house ? ”
, In the classics we are told that Ulysses sought to escape service at the siege of Troy by feigning madness; and that the herald Palamedes found him plowing the seashore with a bull and a horse yoked together and sowing the furrows with salt. Palamedes detected the trick by placing the infant Telemachus before the plow, and taxed Ulysses with *437 the deceit when he observed he carefully turned the furrows to save the child.
Junius Brutus and Rienzi, each assumed the character of half-witted to save their lives and at the same time to study the design's of the tyrants they had resolved to overthrow; and 'this was continued by each without discovery or suspicion for years. The medical books report cases where malingerers for long periods have evaded discovery in hospitals under the eyes of physicians; in one case for two years, until, thrown off his guard and exposed, the fraud was confessed by the dissembler. The resolution with which such men have endured suffering rather than abandon their attempt to escape justice, almost passes belief. But there is an authentic case in which a man submitted repeatedly to severe surgical operations for pretended disease, before he would succumb and admit he had been feigning.
A considerable part of the testimony was addressed to the mental condition of the prisoner’s father and to the behavior in early youth of the son; but these statements are comparatively unimportant in view of the great mass of testimony bearing upon the real point of the inquiry — the mental condition of the prisoner at this time, commencing with the day of the sentence.
The testimony of the witnesses for the prisoner was designed to show that about the time of the sentence various alterations in the personal appearance and mental condition of Schneider developed themselves. The first relied on was the change in his personal appearance. During the trial he hád been a neat and rather dressy person; but, from the time of the sentence, he began to present a slovenly look; his handsome clothes were laid aside; he appeared at the time of the sentence without a white shirt or collar, in old, ill fitting clothes, the same he wore when before the court here; with a shabby overcoat pinned around his neck, and with hair and beard untrimmed and uncombed.
Indifference to neatness is not an uncommon accompaniment of real madness; but its studied assumption is the *438 almost unvarying device of the malingerer. Shakespeare gives to Hamlet, and to Edgar in King Lear these readily assumed pretensions to insanity. Hamlet appears—
“ With his doublet all unbraced ; no hat upon his head, his stockings foul’d,
Ungarter’d, and down-gyved to his ankle ;
Pale as his shirt, * * *
His bedded hair, like life in excrements,
Starts up and stands on end.”
Edgar, when determining to assume the part of an insane outcast, to save his life, says:
“ My face I’ll grime with filth,
Blanket my loins, elf all my hair in knots,
And with presented nakedness outface
The -winds.”
So simple a device, in itself, can have but little probative force. But the proof here shows that Schneider himself suggested, to his mother the removal of his good clothing, and that the old butternut pantaloons and other shabby garments he has been wearing constantly since the sentence, were not his own old clothes, formerly worn by him, but were specially obtained for him; that his outward appearance of squalor did not prevent him from changing his underclothing at proper intervals, and that* these were found clean, instead of befouled, as is the custom with the insane who fall back to the helplessness of infants in this respect; and further that as his beard and hair had already attained a long growth on the day of the sentence, he must have determined upon this carelessness long before that day arrived; and that he 'in fact appeared in all this disorder of dress and person before the sentence had been actually pronounced, and therefore before the alleged shock could have been fully realized.. The explanation that the old clothes were furnished him to lounge in while in his cell does not explain why he should have persisted in wearing them at this hearing, where he was not lounging on his bed, but was all the time seated quietly in his chair.
The alleged delusion that his food was or would be poisoned in the jail, and his refusal on this account to eat, is the *439 subject of much of the testimony. Dr. MacWilliams testifies that a ‘real refusal to eat was evinced from his first admission to the jail, on the night of the murder. When the doctor’s attention was called to it, he endeavored .to induce Schneider to take food; but he refused, declaring he would never eat again; but he gradually rallied and his appetite returned. Surely it was not unnatural that one guilty of such a murder should not when first imprisoned, be able to' enjoy his meals as if he were at liberty and innocent. From this time until the sentence, there is no defined proof of any failure on his part to take the jail food. After the sentence on the 9th of May, at which time this and all the other delusions, according to the weight of the testimony, developed themselves, the evidence shows that although he refused to take his meals in the day time, as the other prisoners did, he yet ate that same food in his cell every night for at least a month, undeterred by fear of poison. The guard, Payne, swears that later on during July, Schneider at night ate food that he cooked for him at his own house. Crusor, another guard, testifies that after July Schneider received food from him at night up to the first of November, which Crusor had brought him from his house. It was contended it was quite consistent with hi$ alleged fear of poison, that Schneider should have consented to receive food from Payne and Crusor, because he had confidence in them, while he refused it from others. But it remains unexplained why he' should not have been equally willing to receive his .food from those same trusted hands at the ordinary hoürs in the day, or after November. We can' understand this discrimination if he was playing a part, and, wishing the public to believe he was starving himself for fear of poison, he ate only at night, when observers were in) their cells. After November his mother brought him food nearly every day, more than sufficient for his nourishment; and that he ate it is clearly shown by his physical condition, as proved by the witnesses, especially by Dr. Bovee and Dr. Godding. The latter gentleman, produced as an expert witness on the *440 part of the prisoner, testifies that, after careful examination, he saw no sign of starvation or innutrition, and 'says in conclusion, "I was compelled to rule out starvation in the case; I thought he got nourishment enough.” Indeed, the fact that he lost but nine pounds between the day of the sentence and the hearing here is conclusive upon the point. The utter disproof of this repeated pretension of Schneider that he was starving himself cannot but tend to discredit his assertions as to the other delusions.
The witnesses for the prisoner dwell especially upon Schneider’s reiterated assertion that he could not sleep at all; and this assumed fact is much relied upon as evidence of insanity.'' Could it be possible that a man in his situation, having even the remnant of a conscience, could expect to sleep tranquilly all night without its goadings reminding him of the cause of his imprisonment? He would not have been the first homicide to exclaim—
“ Methought I heard a voice cry ‘ Sleep no more.’ ”
But Schneider had been imprisoned since January 31 1892, and was now locked up in a small cell, in sweltering weather for much of the time, smoking inordinately day and night, neglecting to take exercise, and lying on his bed much of the day. These would be adequate explanations of a failure to enjoy undisturbed sleep at night. The witnesses who say they saw him awake at all hours of the night, do not state it was at all hours of the same night. Many an innocent person, of sound mind, was doubtless frequently wakeful at times during this period. But the witnesses for the United States give a different version of his habits, in this particular. One who chanced to observe Schneider the night before he testified here, stated he thought Schneider slept at least one-third of the time between eight p. m., when he was locked up, and eight a. m. when the cell door was opened — not an insufficient amount of sleep for one lying down much of the day. Imsomnolency when a symptom of insanity, is said to be generally complete, and knows no amelioration until the patient succumbs, or artificial means are *441 applied to relieve it. The strong, indeed conclusive fact, is mentioned by Dr. MacWilliams the jail physician, that although he frequently gave bread pills or similar simples to gratify Schneider’s supposed complaints, he never was called on by him to give, and never has given him a narcotic since he has been in the jail. Persons in ordinary health frequently éxaggerate their own wakefulness, apparently to excite sympathy or to give themselves a temporary consequence; and Schneider may have mistaken a troubled sleep for wakefulness; even if the entire idea be not unfounded.
The placing of his rocking chair on his bed is shown to have furnished a comfortable support to his back while lying down; and as he occupied the cell in which Guiteau was confined when some one shot at him from the open common outside (which extends up to the outer window of the- jail without any protection), he may have hung the chair in the window on the occasion mentioned, either to screen himself from observation, or from what he may reasonably have thought was a dangerous exposure.
The foregoing are all the alleged physical delusions or symptoms complained of by Schneider that may be considered external, and which are therefore capable of actual verification or contradiction by witnesses. The others — such as the whisperings; the voices; the fear of poisoning; the faces in the wall; the throwing of acids in the cell; the refusal to have his hair trimmed from apprehension of personal injury; the alleged belief that his brothers and his mother had turned against him; the pretended electrical inventions; his belief that he owned swift horses and had money in bank — must be taken as actual beliefs and delusions solely upon Schneider’s-assertion, or not at all. It makes no difference that a score of persons may say he asserted them to be true, there is but one witness to the truthfulness of either of them after all, and that is Schneider himself. Of course, if he did not believe all or either of them, the entire story must be discarded as a cheat. Was there anything in the account given of his previous moral characteristics by his own wit *442 nesses, to justify us in believing him'.in this instance? With one accord all these witnesses agree that from his earliest youth, pre-eminent over all his other j vices, was his addiction to fálsehood; that his whole talk was a gasconade of impossible exploits and ridiculous lies.
Schneider’s testimony before the jury was a coherent defence of himself, from his standpoint, but it'was contradicted at every point by disinterested witnesses, who were not on trial for murder and struggling’for their lives; and the jury refused to believe him. Why should we believe the present story simply because it comes from him? “What will not a ¡man give in exchange for his life? ” In the light of his character, as shown by the testimony of his own witnesses, can any man of sense doubt that if the prisoner really believed he would be allowed to walk unmolested from this court-house if he should now charge the murder of his wife upon his counsel or any other person present, he would hesitate to' make the charge?
The authorities state that among the reasons for suspecting dissimulation in cases where the party has been committed for an act which will cause the forfeit of his life, is the fact that his “general character is open to imputations of malice and deceit.” 3 Wharton & Stille, Med. Jur.
The evidence is uniform that few persons cam more thoroughly deserve to be included in this last description than this unhappy young man, the faithful imitator of Hogarth’s Idle Apprentice.
We have no time to enter here upon an examination by comparison of the mass of testimony produced by the opposing parties. We are satisfied the weight of the testimony bearing upon the sincerity of the alleged delusions is very greatly on the side of the witnesses produced by the United States, and hence Schneider’s asserted- beliefs not only, receive no support from the testimony of others, but their sincerity is discountenanced by the great weight of the evidence.
Of the twenty witnesses called by the prisoner’s counsel *443 at this -point, eight were employees or prisoners in the jail. Of those called by-the government, fourteen were residents or employees there; and their intelligence and apparent candor is equal, to say the least, to that of those adduced by the prisoner.
Many of .the witnesses on both sides, not examined as experts, 'were at the conclusion of their testimony asked their opinion as to the sanity or insanity of the prisoner. Such opinions, of course, should be based only upon the facts testified to by the particular witnesses, and are of value (apart from the character and manner of the witnesses) in proportion to the importance of such facts. Where the facts testified to by the witness as the ground of his opinion are few or trivial, or simply such incidents as are common alike to sane and insane people, it is improper to -ask for an opinion, for it can have no probative force. A striking example of this description of opinion is shown in the examination of Mr. Isdell in behalf of the prisoner (479).
The witnesses for the prisoner expressed their opinions as follows:
Wheat, a prisoner in the jail, and who acted as messenger or steward, said:
“ I would not like to express a positive opinion as to his sanity or insanity; I think the man’s mind is undoubtedly unbalanced, or he is a very fine actor; I have seen persons feign insanity; I do not think he is feigning; I have seen him a half-dozen times — unchanged.”
Officer Strong. “ Talked with him very little the last two or three months; I would not say the man is crazy or not crazy; he acts like a crazy man; the other day he said, ‘how do you do, Mr. Strong? ’ ”
Guard Crusor. “ My opinion about it was that his mind was not right at all, with his fasting and smoking so much night and day, and other little matters there; altogether I thought it had affected his mind.”
“ Question. In your opinion, is he insane or not?
“Answer. I could not say; I do not know much about *444 insanity. He don’t seem to be right; I don’t think he has ■any appreciation of his present condition, because it don’t seem to impress him. He seemed to worry about his wife before she died; after that he got calmer.”
Go erke. “ I came to the conclusion he was out of his head; to tell you the truth, I did think he was crazy.”
Parsons said:
“ My present judgment is colored by knowledge (by rumor) that I have liad through years. I would say that he has had a long-standing mental cloud — in my judgment.”
Warden Burke. “ His condition was rather one of mental .apathy. He did not appear to anticipate anything; rather indifferent to every thing — appeared that way to me.”
Dr. Beatty. “ I believed he was crazy when I first saw him in jail,'which was when he first came in — a number of weeks before his trial”.
This, of course, is inconsistent with the idea that the insane delusions were produced by the trial, conviction, and .sentence.
Mrs. Schneider, whose situation when on the stand appealed to the pity of everybody — when, examined about the mental condition of her son in his younger days, after speaking of his .disobedience and general ill-behavior, said:
“We thought a good many times there was something wrong, from his actions — things that he would do; there was no appearance of insanity in any of the other.children; he never mentioned to me the jail food, or the invention, or the poison, or the want of sleep, or the acids, until later on: he was very much excited about the trial and talked over it.”
Dr. Walsh, an old acquaintance, said: “ People and every one spoke of him as being off, as a youth; impression made on me that there was something wrong with him; that he was not quite right; that he was peculiar; I think he is of unsound mind; I think he has not any appreciation of his condition as a condemned man; before the murder, along *445 time ago, I thought and spoke of him as being insane; I thinkjie is suffering from monomania, not dementia”
Dr. MacWilliatns. “He is either the sharpest trickster that ever walked, or the man’s mind is unsettled. I cannot say that I have observed anything that indicated he is ma-. lingering.”
Kuhnert, another of the persons in attendance on Schneider, said:
“He talked of poison in April; I would leave him up: and in the morning find him up; his peculiar conduct began in June.”
Blundon, a former acquaintance, said: “My conclusion was, he was not right, and told his brother he would get him into trouble. I have no facts as far as his conduct is-concerned. I never considered him right.”
Hurlebaus, a former acquaintance, said: “ I regarded him as foolish- — -a person who did not have all the sense he ought to have; I never thought he did in those days — always looked upon him in that way.”
Springman, one of the guards, was the person most with Schneider, having brought him up here each day and carried him back, but no opinion was asked of him.
Mrs. Russell, matron at the jail:
“If it is possible he is shamming, he is the finest actor I ever saw; we have tried to think he is shamming, but I believe it is impossible; he is either insane or his mind is gone; whether it is imbecility or insanity, I am not enough of an expert to say; I should count his reason gone, because I have tried to reason with him and could not; in my opinion he is not shamming; I have never seen or heard anything to make me think he appreciates his present condition as a man condemned to death.”
On the part of the United States, the testimony was as-follows:
Graham, 'one of the guards at the jail, said:
“When sentenced to death I think he understood it; I cbuld not say whether he comprehends it now, but I think *446 he is substantially in the same condition he was then; took food from me and Crusor.”
Coleman, a guard, said:
“I do not think he is insane; I have never seen anything to make me think he was, or to -indicate he is insane.”
Buckley, the steward at the jail:
“ Shortly after the decision in General Term I was talking to him about his trial, and told him it went against him; he said he would take it to a higher court.”
Dutton, an officer, says:
“ I think he knows right from wrong, and appreciates the situation he is in; I never saw anything of an insane nature in him before the trial; his condition is pretty much the same.”
Borden, a real estate man, who was intimate with Schneider, said:
“ I saw nothing peculiar about him.”
Bryan, an officer in the rotunda of the jail, says:
“I do not think he is insane; I think he understands he is under sentence of death, I never did think he was insane.”
Woodward, a guard at the jail: *
“ On the 8th of January Wheat told me Schneider was sick with a terrible burning, etc.; Schneider then talked very rationally; I told him he was to take a wineglassful of the medicine prescribed by the doctor every two hours; next morning he said, ‘I ought to have had the medicine some time ago ’; I told' him ‘ No ’; he was very touch frightened; I think he is sane, and understands and appreciates his situation; I could not -say whether the terrible strain of the trial has changed his mental faculties in any way; walking the cell is frequently done by the other prisoners.”
Russ, deputy warden at the jail:
“I think he is sane, and has mind to comprehend his situation the same as you do; I do not see any signs of insanity; the change was too sudden; I think he is shamming.”
Peacock, a guard at the jail:
"I should take him to be a sane man; I think he.under *447 stands every thing that is going on, that he comprehends the situation and there is nothing to make me think otherwise.”
Houton, his employer when he was in the postoffice service, who, with Arrington, talked with him at the jail, said:
“I could see no reason for thinking him irrational.”
Arrington said:
“ It struck me that the conversation was entirely rational; nothing odd or peculiar that impressed me; it did not occur to me that he was anything except that he was a sane man; I don’t think I had previously heard anything said about his being insane.” ,
Cross, who knew him before his trouble, said:
“ I see no change in Schneider.”
Dennis, of the Coast Survey, said Schneider was there until 1888 as a draughtsman, and that he observed no peculiarities in him.
Lindenkohl, of the Coast Survey:
“•He always talked rationally; I never noticed the reverse.” Fowler, of the Coast Survey:
“Noticed no peculiarities that indicated he was irrational.”
Dr. Bovee:
“ My opinion was that he was sane — that the delusion, so called, was feigned; as an expert, on all the evidence, I believe he is sane; I so told MacWilliams.”
Knight and Slaven say the same.
Roswell A. Fish, foreman of the jury that tried Schneider for the killing of his wife, describes Schneider’s conduct during the trial in communicating with his counsel from time to time, apparently in a perfectly sane manner, and says:
“ He was always alert; had control over his acts and emotions; keenly sensible of everything going on; deeply aware of what was going on.”
Dutton, reporter of the Star, in describing Schneicfer’s actions at the trial, said:
“He comprehended everything; I saw nothing to show his mind was inactive; impression made on me was that he was rational.”
*448 This witness when asked whether, when Judge Bradley sentenced Schneider, “he did not present a dazed appearance,” replied he did not, “ but a careless, indifferent manner —-he refused to look at the judge.”
Joyce, one of the bailiffs of the court, who testified as to his assault on the district attorney on the day of the sentence, said: “ I would take him to be a sane man.”
McGill, who was a lawyer in a patent attorney’s office, where Schneider worked from 1884 to 1886, as a draughtsman, said: “I never saw anything to lead me to suppose his mind was not right.”
These are all the laymen who testified as witnesses on the point, and, in number and in importance, those adduced on behalf of the United States decidedly outweigh the others.
The list of witnesses examined on behalf of the prisoner is more remarkable for its omissions than for the names it contains. It is proved that beside Gottlieb Schneider, the prisoner’s father, there are four uncles and two aunts, and one uncle by marriage, of the elder generation, living in Washington; and two brothers and five sisters of the prisoner. It also appears that a number of cousins belong to this large family; and yet, in this vital inquiry, not one of these kinfolk is called to testify as to the insanity of the prisoner; his poor mother being the only relative who is asked a word on the subject; although the two aunts and one of the uncles are called, on opposing' sides, to speak as to the mental condition of Gottlieb, the father. His brother, William, the eldest son of the family, is placed on, Ithe stand on behalf of the prisoner, only to testify as. to’ clothing and food carried to the jail. Can it be doubted they woúld have been examined upon this all important question, if they could have sustained the prisoner’s contention? We are not at liberty to allow this pregnant fact to pass unnoticed.
The broad contention in behalf of the prisoner is that since the impact of the sentence, he has been unable to’ realize his situation, so that he really knows nothing of his *449 trial, of his ¡wife’s death, of the reason for his being in jail now, of his family or friends, of the season of the year, or of his former home. Several statements made by him, at different periods from the time of the sentence, show clearly that this assumed ignorance must be feigned, if the witnesses are to be believed.
First, the statement of Crusor, that he became more cheerful, calmer, after the death of his wife, is a most significant one, because she would have been a witness against him on an indictment for an assault upon her, and her death removed this danger.
Graham, the guard, says that one night about 6 or 7 o’clock, “he asked me if the court in General Term had decided the appeal against him — if anything had been done in his case.” It was in January, 1893. “ I told him, yes, the court had decided against him.”
This is inconsistent with his idea that he knew nothing about the case.
Buckley, the steward at the jail:
“Shortly after the decision of the General Term, in January, I was talking to him about his trial, and told him it went against him. He said he would take it up to a higher court.”
Payne, a guard at the jail, says:
“The evening after he was sentenced, he said he had attempted an assault on the district attorney, but he thought it would have been better if it had been made on his counsel; he said further, ‘I made a big mistake to-day at the court, and I am afraid it will go worse with me at my trial.’ ”
When Russ, who was not a particular friend of Schneider, went to vaccinate him in November, and told him to roll up his sleeve, he consented after an explanation was made of what was wanted.
Peacock said Schneider told him in July, when he was trading some tobacco with him, that he believed he, Peacock, was “ one of his friends,” and yet, “ he never mentioned his notions to him; but said lately, during this investigation, they bothered him a great deal up at the court-house.”
*450 Houten, a postoffice inspector, stated that “on the 27th of July, 1892” — and the date is proved by an entry made in bis memorandum book — “he had gone to the jail to see a prisoner, and was standing in the rotunda with Mr. Arrington, when Arrington said, ‘ somebody is there calling you ’ ”; he looked and saw somebody at the grating. “ Schneider beckoned to me; put his hand through the grate and we shook hands, and he said, ‘ how do you do, Captain Houten; don’t you know me?’ I replied, ‘no; I do not.’ Schneider said, ‘ I weighed mail for you.’ ”
Houten said that Schneider had been employed weighing mail; that although he heard of the trial, he paid no attention to it; did not associate him with this Schneider. He asked Schneider what he was doing there, or some remark of that kind, and he told him. He remembered that Schneider said he was not getting enough to eat. “He told me he was there for killing his wife, but said he did not kill her; he would get another trial, and then it would be shown he was not guilty. I could see no reason for thinking him irrational.”
Arrington stated that Schneider said:
“ I am going to try to get a new trial, and will be acquitted; the trial was a farce; the judge ruled against me every time; I am about starved to death; they don’t give me as much food as I can eat.”
Cross was committed in June upon the charge of forgery of the name- of Mr. Walbridge, and released on bail; Walbridge and Overton had testified against Schneider before the jury. Cross, who had known Schneider before, and had been in the court-house at the time of his trial, stated:
“Four or five days after I got there (in the jail) I went to his (Schneider’s) cell. He wanted to know what the people, the business men, 'outside said of him. I told him J had heard some expressions against him. He told me of several persons who had perjured themselves on the trial; said nothing of. poison or noises, or acids or inventions, or his brother’s unkindness. Mr. Walbridge came down to see *451 me on the 10th of July. The next day afterwards Schneider 'asked me what I was talking to that old .s — n of a b— for; that he was a damned old perjurer; that he (Schneider) had tried to get out into the rotunda; if he could have done so, he would have combed his (Walbridge’s) head with a chair. Walbridge’s next visit was the 13th, or first or second week of August (he knew that by a letter he received at the time). Schneider complained about Walbridge and his wife, scored them, and said Walbridge need not think he was out of it; he had two brothers who would avenge his life if he was hung, because of the perjury; also spoke in the same, way of Overton. He also said that Overton was a perjurer; that he need not think he would get out of it; that his brothers would avenge his death.’ ”
Dutton, the reporter of the Star, said that he “ was at the jail a few days after the trial. Schneider asked what I thought of the verdict. I told him it was justified by the evidence. He said, ‘ I don’t see how you can think that,’ bursting into tears, ‘ I did not have a fair show; my witnesses were not believed; everybody was against me.’”
McGill, a clerk in the office of Myers, said:
“In February, 1886, I told Schneider a colored boy had told me Schneider was seeking to get him to throw vitriol on somebody he had a feeling against. I told him of the consequences. He said he did not fear the consequences at all; that 'if he should be arrested he would feign insanity, and asked if I would testify that I believed him to be insane. I told him immediately if moral obliquity constituted' insanity I would. A week after his discharge (which was caused by his getting money from one of our clients) he came in the office and whipped out- a pistol from his pocket and told Mr. Myers he would shoot him unless he apologized. Whereupon Mr. Myers threatened to throw a paper weight at him and he left the place.”
Finally, a young man by the name of Connor was produced, who kept a feed store in .the neighborhood of Schneider’s stable. The first acquaintance Connor had with *452 Schneider was when a messenger came to him and told him Schneider had a carriage for sale. That brought them together, and Schneider made purchases from the store. Con-nor came down to the court during the trial, and had a conversation with Schneider there, and another in the jail. Connor said:
“I saw him after the murder in a little room near the criminal court, down stairs, at the trial. I went out and got him some whiskey twice. Afterwards I saw him at the jail, while the trial was going on. Afterwards in May at the jail, his brother was there. After the trial I received two letters from him asking me to come down there to see him. When I saw him there, he did not speak at first; said nothing for a minute; then he said, ‘I feel bad; I didn’t want to recognize you at first’ ; he kind of smiled at that, winked his eye. Some passing officer asked where his brother lived. He first said ‘ F and 6th street,’ he then looked at me, and told him right. As somebody, passed by he said, ‘The wind rushes down there and sweeps away everything it hits ’ ; he said ‘ It would be a good idea to write me a crazy letter’; I told him it would be. He said he would be out of there in a few days. He said he wanted to make them people believe he was crazy. He winked his eye a couple of times when he said funny things. I gave him some money; he did not want to ask his brother for it, as he was doing so much for him. He asked for it in a letter, to buy .tobacco with.”
This is not in accordance with his alleged delusion that his brother was inimical to him, and that he would not see him or have any communication with him.
“ He said Marion Appleby served him a dirty trick by not coming down. He' told me if I saw him to tell him to come down. Fie said Jack Green had got a gallon of whiskey for him and drank it all up. This was during the trial. After the sentence he had his coat turned up and undershirt on; no white shirt. He said, ‘ I wanted to make out as if I did not know you.’ ”
*453 The inquiry we have been pursuing is one of the greatest interest, and of no little difficulty. It is to test the mind by the only .possible agent — another mind; for no other thing is of a grade sufficiently high to serve the purpose — the diamond can only be cut or polished by its fellows.
There are forms of simulation not difficult to detect. Such are the noisy imitations of maniacs which ignorant people who have made no careful observation of insanity suppose to be the constant type of mental alienation. Nature itself aids in the detection of this clumsy form of malingering, for no human frame, not belonging to a madman indeed, can continue such devices indefinitely; and the trickster, if steadily watched, will sooner or later be found remitting his violence when he believes himself unobserved. The more difficult form that seems sometimes to defy detection, is the -dull, moody, morose manner — the appearance of imbecility: of inaction rather than action. This is precisely the form Schneider has adopted. The scheme seems to have been matured after the outburst in the court-house on the day of the sentence, when he made an assault on the district attorney. Ever since he has maintained before all but his special friends (as he believed them to be) this impassive demeanor. The difficulty of maintaining this role was presented in the following examination of 'Dr. Godding, who was being examined by Dr. Chapin:
“ Question. In your judgment, is it possible for 'a person to feign the symptoms you have observed successfully? ,
“ Answer. It would be difficult. I suppose it is possible.
“ By Mr. Mattingly.- Question. Would it be possible for an ordinarily ignorant man?
“Answer. No, sir; I think a man must have had some special training in insanity to feign successfully the symptoms I have observed.
“By Dr. Chapin. Question. Suppose he had observed cases?
“ Answer. I will allow that.”
We have before us the proof that few persons were more *454 competent to imitate this special form of mental aberration than Schneider; for from his birth he has had before him his father, whose manner, as described by his poor wife and sister, is almost precisely like that now assumed by the prisoner. The testimony of Mrs. Schneider was that her husband would be smoking, lying around; that he is an old person,- and is childish; that he would say every one was against him, and would hurt him; that he was moody and morose; that he said electricity was going out of his hair; that lie had staring eyes; would get to smoking, and would not sleep; that he complained of his head; said that his blood was vitiated by the fumes of brass; that he complained of his brother; that he sits at home and does nothing — exhibiting just such symptoms as this prisoner has done since his change of deportment began.
For want of time, I must pass with brief comment the two other classes of evidence adduced. First, as to the mental condition of the father. We are spared the necessity of weighing the conflicting testimony upon that, because we are well satisfied, from all we have seen and read, that the commission was correct in the assertion in their supplemental report, that insanity suddenly developed late in life is. not transmittible to the children. While not dissenting from this position entirely, Dr. Godding said, in reply to a remark by Dr. Chapin, “Yes, you must remember that the child born nearest the development of insanity would be more likely to take the symptoms, and Howard Schneider was the first one bom after the development.” But this statement is not correct. The symptóms spoken of were developed in Gottlieb Schneider in 1862, and in 1863 Alice was born, who was, therefore, the first child born after the attack, while Howard was not born until the spring of 1866: so if it be true “ the first child would be more likely to take the symptoms,” the sufferer would have been that daughter. Yet there is no pretence of any suspicion of insane taint in that daughter or any other member of this large family.
Another class of testimony detailed Schneider’s evil deeds *455 during his youth and before this crime was committed. It is enough to say that admitting the truth of any one of the iniquities described by these witnesses, or admitting them all together, there is no court in Christendom that would not have told the jury that either or all combined would not be proof of such mental alienation as would justify a verdict of acquittal of crime under the defence of insanity. Wickedness is not insanity. No matter how .vile a man may be, he is not to be exculpated and freed from punishment, simply because he is shown to be enormously bad.
In arriving at our conclusions we- think we have given just weight to the opinions of the three experts who testified on behalf of the prisoner. They all admit the case presented here is exceptional — that symptoms are not present that would usually be found in either of the recognized types or forms of insanity, while there are present other symptoms that do.not accord with any other type; that the prevailing symptoms are such as would not be expected to develop suddenly, but, would present an onset in a primary or incipient form, followed by an acute form, • and then by a terminal stage; that this case is either in the chronic or the terminal form, but that there is no- proof of the evolution from the primary stage. If insanity came at all to Schneider, it must be admitted the proof shows it came just after the sentence, in a fulminate form, and fully equipped with all the delusions at once. We have, therefore, the final or the chronic stage established by the proof, and no precursor is shown to have ever existed.
Dr. Godding’s theory is, either that this may be one of the very exceptional cases which comes without the usual evolution; or that the previous stages came in fact entirely unnoticed; and that the taint in the father aided in the development. As we are required, before we can nullify the verdict of the jury and the judgment and sentence of the court below, to find th-e prisoner is actually insane, so as to be wholly unconscious of his situation, we do not feel justified in assuming the present to be so wholly exceptional *456 a case as either of these explanations would imply; especially as we are convinced the alleged delusions are all feigned for a purpose.
We are relieved to find that our conclusions in the case are in accord with the views of the members of the commission, who, we believe, have discharged their important duties with like impartiality and ability.
It results that we must decline to interfere by deciding the prisoner to be insane, and the law, therefore, is left to take its course.
An order will be passed by the court in accordance with these views.

 The following was the order:
“This Court, to assist in ascertaining truly the mental condition of the said Schneider, desires to obtain the opinions of competent medical experts in mental diseases, in the most reliable manner; and to that end this day, Orders
“ 1. That Doctors A. E. Macdonald and Allan MacLane Hamilton, of New York City, and Doctor John B. Chapin, of Philadelphia, be and they are hereby constituted and appointed a Commission to report to this Court, at as early a day as may be convenient, for the consideration of this Court, their professional opinion as to the mental soundness or unsoundness of the said Schneider, the said report to be given in writing, and verified by their oaths thereto appended, taken before the clerk of this Court.
“That the said experts shall make a careful examination of said Schneider personally, both together and by each one of said commission separately at the said jail; in such manner as to them shall seem best; and they are also authorized and empowered to make proper examination of the employees and officials of said jail; in their discretion, under oath, to be administered by a justice of the peace.
“2. It is further Ordered that the counsel of the prisoner may procure the services and attendance of skilled medical experts in mental diseases, not exceeding three in number ; who are also authorized and empowered to make a personal examination of the said Schneider, either together or separately. *435 “3. It is further Ordered, that on Wednesday, the 1st day of February, 1893, at 10 o’clock A. M., this Court will enter upon an examination of the said allegation of insanity of the said Schneider in the court room of the General Term, at which time and place the members of the said commission shall attend, for the purpose of hearing the testimony there taken, and of further observing the said Schneider. And in behalf of said Schneider the said medical experts to be produced in his behalf (as provided in clause No. 2 of this order) together with a reasonable number of other witnesses to be produced on his behalf (in the discretion of the Court) and a reasonable number of other witnesses to be produced on behalf of the United States (in the discretion of the Court), shall be examined, oir oath, in presence of the Court.
“4. After the conclusion of the testimony so to be taken before the Court, and of the personal interrogation of the prisoner by the Court, if the Justices shall see fit to make such interrogation, all in the presence of the said commission, the members thereof shall return their report and opinion for the consideration of the Court, in form as is provided in clause No. 2 of this order. By the Court,
“E. F. Bingham, C. J.”